No. 24-6014

# In the United States Court of Appeals for the Tenth Circuit

RAUL RODRIGUEZ, JR., PLAINTIFF-APPELLANT,

V.

LOUIS DEJOY, POSTMASTER GENERAL OF THE UNITED STATES POSTAL SERVICE, DEFENDANT-APPELLEE.

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

THE HONORABLE JOE HEATON
DISTRICT JUDGE

D.C. NO. 5:22-CV-00618-HE

BRIEF OF DEFENDANT – APPELLEE
ORAL ARGUMENT NOT REQUESTED

ROBERT J. TROESTER
United States Attorney

REBECCA A. FRAZIER
SARAH GREENWALT McMURRAY
Assistant United States Attorneys
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
Telephone (405) 553-8700
Attorneys for Defendant-Appellee

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................v-vi

GLOSSARY OF TERMS.......................................................................vii

PRIOR OR RELATED APPEALS.......................................................viii

JURISDICTIONAL STATEMENT.........................................................1

STATEMENT OF THE ISSUES ............................................................1

STATEMENT OF THE CASE ................................................................2

    I. Material Facts ...............................................................3

        A. The Postal Service's Oklahoma District Office Issued Directives to the Sooner Office.............................................3

        B. Incident One – In May 2020, Mr. Rodriguez's route (along with two other routes) became overburdened and was accordingly adjusted by the Oklahoma District Office........5

        C. Incident Two – Mr. Rodriguez engaged in a verbal and physical altercation with a Postal Service customer on July 23, 2020, while delivering the customer's mail...................8

        D. Incident Three – In September 2020, Mr. Rodriguez's route was among the 2,000 rural routes nationwide selected by Postal Service's National Office for a special count...........10

        E. Incident Seven – Mr. Rodriguez engaged in a verbal altercation with his supervisors Amber Reimers and Travis Swaner on December 21, 2020, and was put on Emergency Placement.........................................................................12

    II. The District Court's Order Granting Summary Judgment......14

        A. Judgment on Mr. Rodriguez's Claims

1. Title VII Gender, Race, Color, National Origin Discrimination Claims ...............................15

2. Title VII Gender, Race, Claim, Color, National Origin Hostile Work Environment Claims.........................15

3. Rehabilitation Act Hostile Work Environment and Discrimination ..........................................16

4. Title VII Retaliation Claims...................................16

SUMMARY OF THE ARGUMENT ........................................17

I. Mr. Rodriguez Has Waived Several Arguments, and He Now Raises New Arguments with New Evidence...........................19

II. The District Court Properly Found Mr. Rodriguez Failed to Establish Title VII Discrimination or Retaliation ..................22

A. Standard of Review ...........................................22

B. The District Court Correctly Dismissed Mr. Rodriguez's Retaliation Claim ..............................................24

C. The Postmaster's Legitimate, Business Reasons for its Actions.......................................................25

1. *Route Change (Incident Three)*................................26

2. *Emergency Placement (Incident Seven)*.....................26

D. The District Court Correctly Found That Mr. Rodriguez Failed to Create a Genuine Dispute of Material Fact As To Pretext.........................................................28

III. The District Court Properly Found Mr. Rodriguez Did Not Establish a Rehabilitation Act Violation ..................................30

IV. The District Court Properly Found That Mr. Rodriguez Did Not Experience a Hostile Work Environment Based on His Protected Characteristics ..........................................................32

V. The District Court Properly Found Mr. Rodriguez Failed to Offer Evidence of Discriminatory or Retaliatory Animus........35

CONCLUSION.....................................................................................35

CERTIFICATE OF COMPLIANCE......................................................37

CERTIFICATE OF SERVICE...............................................................37

INDEX OF ATTACHMENTS ..............................................................39

Attach. 1:    *Raul Rodriguez, Jr. v. Louis DeJoy, Postmaster General*, Case No. CIV-22-618-HE, United States District Court for the Western District of Oklahoma, Order [Doc. 55] (order of dismissal)

Attach. 2:    *Raul Rodriguez, Jr. v. Louis DeJoy, Postmaster General*, Case No. CIV-22-618-HE, United States District Court for the Western District of Oklahoma, Judgment [Doc. 56]

# TABLE OF AUTHORITIES

## Cases

*Alabi v. Vilsack*,
   860 F. App'x 576–84 (10th Cir. 2021) ................................................ 33

*Amro v. Boeing Co.*,
   232 F.3d 790 (10th Cir. 2000) .......................................................... 22

*Ash v. Buttigieg*,
   No. 22-6195, 2023 WL 6293823 (10th Cir. Sept. 27, 2023) ............. 32

*Bekkem v. Wilkie*,
   915 F.3d 1258 (10th Cir. 2019) ...................................... 24, 26, 27, 28

*Bolden v. PRC Inc.*,
   43 F.3d 545 (10th Cir. 1994) ........................................................... 33

*EEOC v. C.R. England, Inc.*,
   644 F.3d 1028, 1044 (10th Cir. 2011) .............................................. 28

*Hall v. U.S. Dept. of Labor*,
   476 F.3d 847 (10th Cir. 2007) .................................. 15-16, 16, 17, 18

*Little v. Budd Co., Inc.*,
   955 F.3d 816 (10th Cir. 2020) ................................................ 20-21, 21

*Luster v. Vilsack*,
   667 F.3d 1089–96 (10th Cir. 2011) .................................................. 20

*McDonald v. Kinder-Morgan, Inc.*,
   287 F.3d 992, 999 (10th Cir. 2002) .................................................. 21

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) ......................................................................... 23

*Montes v. Vail Clinic, Inc.*,
   497 F.3d 1160 (10th Cir. 2007) ....................................................... 24

*Montoya v. Cmty. Health Sys., Inc.*,
   881 F.3d 793 (10th Cir. 2018) ....................... 2, 4, 5, 6, 3, 4, 5, 6, 7, 21

*Nat. R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002) ............................................................. 32

*Padilla v. Mnuchin,*
    836 F. App'x 674–77 (10th Cir. 2020) ......................................... 31, 32

*Plotke v. White,*
    405 F.3d 1092 (10th Cir. 2005) ........................................... 23

*Robinson v. Barrett,*
    823 F. App'x 606 (10th Cir. 2020) ...................................... 23

*Rodriguez v. Brown,*
    No. 21-1124, 2022 WL 3453401 (10th Cir. Aug. 18, 2022) ... 29, 30, 35

*Selenke v. Med. Imaging of Colo.,*
    248 F.3d 1249 (10th Cir. 2001) ........................................... 28

*Stover v. Martinez,*
    382 F.3d 1064 (10th Cir. 2004) ........................................... 22

*Throupe v. Univ. of Denver,*
    988 F.3d 1243–52 (10th Cir. 2021) ...................................... 32

*Twigg v. Hawker Beechcraft Corp.,*
    659 F.3d 987 (10th Cir. 2011) ........................................... 22

*Young v. Dillon Co., Inc.,*
    468 F.3d 1243 (10th Cir. 2006) ......................................... 28

## Statutes

28 U.S.C. § 1291 ............................................................................. 1
29 U.S.C. § 794 .........................................................................1, 31
42 U.S.C. § 2000e-16 ....................................................................1, 23

## Other

Fed. R. Civ. P. 56 ......................................................................... 22
Federal Rule of Appellate Procedure 32 ............................................. 37

## **<u>Glossary of Terms</u>**

CBA             Collective Bargaining Agreement

OSS             Operations Support Specialist

RCA             Rural Carrier Associate

RR              Rural Route

USPS            United States Postal Service

## **Prior or Related Appeals**

There are no prior or related appeals.

## **Jurisdictional Statement**

Appellant Raul Rodriguez, Jr., filed a complaint against the Postmaster General ("Postmaster") of the United States Postal Service ("Postal Service" or "Service") on July 25, 2022, alleging violations of Title VII and the Rehabilitation Act ("Rehab Act").  [Record on Appeal, Vol. I, at 7-17] The district court had jurisdiction of the claims under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000e-16 and under the Rehab Act, 29 U.S.C. §§ 794 *et seq*. It granted the Postmaster's Motion for Summary Judgment as to all claims on January 4, 2024, in a final order. [ROA, Vol. I, 237-246] Mr. Rodriguez timely filed this appeal from that order on January 30, 2024, and on appeal this Court exercises jurisdiction pursuant to 28 U.S. C. § 1291.

## **Statement of the Issues**

(1) Whether the district court correctly granted summary judgment to the Postmaster given Mr. Rodriguez's failure to establish either discriminatory or retaliatory motives for the Postmaster's actions.

(2) Whether the district court correctly granted summary judgment to the Postmaster given Mr. Rodriguez's failure to create a genuine dispute of material fact on the issue of pretext.

1

## __Statement of the Case__

Mr. Rodriguez challenges four (4) separate events[1] that occurred during his employment with the Postal Service in 2020. These incidents include two route adjustments, a physical altercation with a Postal Service customer, and a verbal altercation with Mr. Rodriguez's supervisor, which led to his termination.[2] He alleges these benign workplace events contributed to a hostile work environment and constituted disparate treatment and retaliation due to his Equal Employment Opportunity ("EEO") activity, race, gender, national origin, color, and an injury to his pinky finger that occurred during the customer altercation.

Importantly, Mr. Rodriguez concedes he worked in a Postal Service field office, while most of the events at issue were directed by Postal

---

[1] Before the district court, Mr. Rodriguez identified at least nine (9) separate incidents. [ROA, Vol. I, at 7-17] He now raises only four of those incidents before this Court – Incidents **One, Two, Three, and Seven**. Accordingly, the Postmaster will only address those incidents presented to this Court, as the others are now waived. *Est. of Cummings by & through Montoya v. Cmty. Health Sys., Inc.*, 881 F.3d 793, 801 (10th Cir. 2018). [Aplt. Br. at 7-10]

[2] Notably, Mr. Rodriguez does not contest his termination before this Court, nor did he contest his termination before the district court. [ROA, Vol. I, at 7-17]

Service officials located in the District, Area, and National Offices whom he had never met. Mr. Rodriguez further admits to the multiple physical and verbal altercations in 2020, that he engaged in with his supervisors and a Postal Service customer. Nonetheless, he contends that these workplace events were motivated by discrimination and retaliation. But Mr. Rodriguez's lengthy concessions before the district court belie this assertion. As such, the district court correctly ruled that Mr. Rodriguez failed to establish the Postmaster's actions were pretextual or motivated by an improper purpose and correctly entered summary judgment for the Postmaster.

## I.    Material Facts

### A. The Postal Service's Oklahoma District Office Issued Directives to the Sooner Station.

In 2020, Mr. Rodriguez worked as a regular Rural Carrier delivering mail for Rural Route ("RR") 18 located at the "Sooner Station" post office in Norman, Oklahoma. [ROA, Vol. I, at 80-81] Amber Reimers was Mr. Rodriguez's first-line supervisor from 2018 until his termination. *Id.* at 78. Greg Avery was the City Carrier Supervisor; he was not Mr. Rodriguez's

direct supervisor in 2020.[3] *Id.* While Mr. Rodriguez served in one of the Postal Service's 31,000 field offices, the Postal Service had a National Office located in Washington, D.C., five Area Offices, and 67 District Offices across the country. *Id.* at 74. The Oklahoma District Office provided operations support to over 200 field offices regarding approximately 1,387 rural routes within the State of Oklahoma. *Id.* at 77. Jennifer Marlowe, whom Mr. Rodriguez never met, worked as the Operations Support Specialist ("OSS") in Oklahoma's District Office issuing directives and providing support to the station managers and other local management, including those at Sooner Station. *Id.* For example, OSS Marlowe sent daily updates on rural routes, those carriers selected for special counts, and those routes considered overburdened or exceeding their evaluation.[4] *Id.* at 77-78.

---

[3] Travis Swaner became the Sooner Station Manager in October 2020 and was Mr. Rodriguez's second-line supervisor. [ROA, Vol. I, at 78] Robbie Steelman was the Postmaster of Norman Main and the Sooner Station; he was Mr. Rodriguez's third-line supervisor. *Id.*

[4] An "evaluation" was an assessment of a rural carrier's weekly workload. It was the size of a carrier's route, such as how many mailboxes the carrier serviced, how many miles he or she drove, and how long it took to carry that route. [ROA, Vol. I, at 75] A carrier's evaluation was used to determine his or her compensation, work hours, and whether the route

OSS Marlowe received instructions and direction from the Southern Area Office, and specifically from Jennifer Kutscher, Delivery Programs Support Specialist for the Southern Area. *Id.* at 78. This included receiving notifications and instructions related to special counts and route changes. *Id.* The Area Office additionally monitored routes that remained overburdened for too long. *Id.* These reports routinely identified thousands of routes included within the Southern Area Office and sent them to the respective District Offices to be corrected. *Id.*

**B.** **Incident One – In May 2020, Mr. Rodriguez's route (along with two other routes) became overburdened and was accordingly adjusted by the Oklahoma District Office.**

Regular rural carriers, like Mr. Rodriguez, were salaried and paid according to their evaluated route.[5] *Id.* at 76. Mr. Rodriguez acquired RR18 in 2007 because he bid on it. *Id.* at 80. He was excited about this route because he could start at 8:00am and be home by noon, completing

_____

was overburdened. Carrier evaluations were updated at least annually by USPS. *Id.*

[5] For example, a carrier with a 48K route was paid 40 hours of regular time and 8 hours of overtime, regardless of whether it took the carrier more time or less time each day to complete the route. *Id.* at 76. He or she received the same pay every pay period. *Id.*

the route in three or four hours. *Id.* At the beginning of 2020, Mr. Rodriguez's route was a 46K, which meant he was paid 40 hours plus 6 hours of overtime.[6] *Id.* at 80-81. For route adjustments, the Postal Service strived to create the most logical route that would produce peak cost-savings for the agency and conserve public funds. *Id.* at 81. The route adjustment of one route could potentially impact *all* routes at a station. *Id.* The District Office attempted to keep the routes "square" because carriers were allotted/charged 12 minutes for each mile. *Id.* In other words, when one route was adjusted, there was likely to be a trickle-down effect for other routes to incur changes in order to make each route as efficient as possible. *Id.* For example, the District Office would deny a proposed route that sent a carrier 15 miles across town from his or her existing route when there were deliveries to be made in an adjacent

---

[6] There were four types of evaluated routes including a "K" route where the carrier had a relief day every week, a "J" route where the carrier had a relief day every other week, and an "A" or auxiliary route where the carrier worked 6 days a week, but the route was evaluated at less than 39 hours per week. *Id.* at 75. An auxiliary route was typically smaller than a regular rural route. *Id.* It was created by taking parts of other rural routes typically because they were overburdened, or an inefficiency had been identified. *Id.* Auxiliary routes were usually assigned to RCAs. *Id.*

neighborhood. *Id.*

By April 2020, Mr. Rodriguez's route had grown to a 47K, and in April 2020, the Oklahoma District Office instructed Ms. Reimers to adjust three rural routes at Sooner Station that it identified as overburdened – RR18, carried by Mr. Rodriguez (a Hispanic male with no known disabilities); RR39, carried by Wendy Sherman (a white female with no known disabilities); and RR12, carried by Douglas Kelley (a white male with no known disabilities). *Id.* On April 14, 2020, OSS Marlowe sent an email updating several local postmasters on the status of route adjustments at their respective field offices. *Id.* She additionally identified errors with the proposed routes for Sooner Station and sent the proposed adjustments back to the field office to "rework".[7] *Id.* Once proposals for route adjustments from the field had been reviewed, adjusted, and approved by the District Office, route changes went into effect. *Id.* at 81-82. Accordingly, the route adjustments for Sooner Station's RR12, RR18, and RR39 became effective on May 9, 2020. *Id.*

---

[7]The District Office routinely declined or modified proposed route adjustments for errors including cutting a route for not making the most efficient use of milage, failing to opt for the simplest line of travel, or failing to identify closer boxes for a particular route. *Id.*

The May 2020 route changes approved by the District Office caused the creation of a new route and caused Mr. Rachid Talibi's salary to increase more than $10,000, because he was assigned a larger auxiliary route (RR40) which resulted in additional hours and mileage. *Id*. The other routes all decreased: RR12 decreased from a 46K to a 43K, RR18 decreased from a 47K to 43K, and RR39 decreased from a 46K to 43K. *Id*. This resulted in a $6,428.00 salary reduction for the individual carrying RR12 (Douglas Kelley), a $6,540.00 salary reduction for the individual carrying RR39 (Wendy Sherman), and a $9,090.00 salary reduction for the individual carrying RR18 (Mr. Rodriguez). *Id*. at 82.

### C. Incident Two – Mr. Rodriguez engaged in a verbal and physical altercation with a Postal Service customer on July 23, 2020, while delivering the customer's mail.

On July 23, 2020, Mr. Rodriguez was involved in a physical altercation with a postal customer while on his route delivering mail. *Id*. at 83. A McClain County officer arrived at the scene and took statements from both individuals involved. *Id*. The incident was additionally reported to the Postal Service Office of Inspector General. *Id*. Ms. Reimers approved relief carriers that same day for Mr. Rodriguez. *Id*. Mr. Rodriguez claims this incident resulted in an injury to his pinky finger. *Id*. at 83-84.

8

Later that day, Mr. Avery texted Mr. Rodriguez to confirm he was "okay" since Mr. Rodriguez went to Immediate Care to seek treatment. *Id.* at 83. Mr. Rodriguez responded with a text message stating, "No broken bones just a little jacked up for a little."[8] *Id.* Mr. Avery's response was, "[g]ood deal get some rest and take care brother ['praying hands' emoji and '100' emoji]". *Id.* Mr. Rodriguez felt like Mr. Avery was concerned and checking on him. *Id.* In this text exchange, Mr. Avery never told Mr. Rodriguez he should not seek medical treatment. *Id.*

Indeed, Mr. Rodriguez saw another doctor (Priya Sahai) a few months later regarding his pinky. *Id.* He was given Tylenol, told by medical staff they did not see "anything", that his finger was "jacked up a little" or "jammed really bad", and that his pinky bendability would return. *Id.* Mr. Rodriguez believes the doctors he saw after the incident overlooked issues with his hand. *Id.* at 83-84. It was not until Mr. Rodriguez sought care from Dr. Mehdi Adham—two years after the incident—that he was diagnosed with a flexor tendon tear. *Id.* at 83-84.

---

[8] At that time, Mr. Rodriguez was not aware of his tendon tear; he assumed he had a "really bad" jammed finger after being told there were no broken bones. *Id.*

**D. Incident Three – In September 2020, Mr. Rodriguez's route was among the 2,000 rural routes nationwide selected by Postal Service's National Office for a special count.**

Special mail counts occurred annually in September. OSS Marlowe was notified of the September 2020 special count by the National and Area Offices, and then disseminated instructions to those in the field. *Id.* at 84. Under the rural postal carriers' Collective Bargaining Agreement, special counts typically occurred when two conditions are met: routes had a 2-hour plus or minus change AND the density of the route had been increased or decreased by twelve (12) boxes per mile. *Id.*

The National Office identified over 2,000 routes nationwide for a special count, meaning that both conditions were met. *Id.* at 84. Importantly, the National Office's list did not identify routes by the carrier's name, only by route number.[9] *Id.* Two routes from the Sooner Station were selected by the National Office: RR18 and RR40. *Id.* RR18 was selected because there was more than a 2-hour decrease in the size of the route (48K to 43K), and it transitioned from an "L" route (12

---

[9] For each route, there were over 50 additional columns tracking every detail related to that route including the number of regular boxes, central boxes, evaluated hours, miles, standing hours, number of flats, number of parcels, etc. *Id.*

deliveries in a mile) to a non-L route (less than 12 deliveries in a mile). *Id*. RR40 was selected for the opposite reason. *Id*. There was at least a 2-hour *increase* in the route size (23A to 40A), and it transitioned from a non-L route to an L-route, all of which would have caused pay increases for the carrier on this route. *Id*. at 84-85.

Mr. Greg Avery and Ms. Amber Reimers met with carriers on these rural routes, Mr. Talibi (RR40) and Mr. Rodriguez (RR18), on August 28, 2020, for a "Pre-Count Conference." *Id*. at 85. Ms. Reimers discussed count procedures and gave instructions about the count such as the timeframe, the forms, carrier schedules, and the importance of carriers validating piece counts. *Id*. Mr. Avery counted RR40, and Ms. Reimers counted RR18. *Id*. Ms. Reimers then verified all the count information and documents for both routes. *Id*.

The carriers had an opportunity to review the route count forms, and if a carrier disagreed with count data, the carrier was not required to sign the PS Form 4241 certifying the count data. *Id*. Mr. Rodriguez signed his PS Form 4241. *Id*. After the special count, the new evaluation for RR18 was a 43J (instead of a 43K), which meant that Mr. Rodriguez was

required to work every other Saturday and maintain the same level of pay. *Id.* at 86.

### E. Incident Seven – Mr. Rodriguez engaged in a verbal altercation with his supervisors Amber Reimers and Travis Swaner on December 21, 2020, and was put on Emergency Placement. [10]

To request annual leave, employees filled out the PS Form 3971, which was then reviewed, and approved or denied. *Id.* at 88. Holiday leave was typically scheduled well in advance since it was essential that the Service had enough carriers available to ensure complete and uninterrupted mail delivery during this period.[11] *Id.* at 88-89.

On December 21, 2020, Mr. Rodriguez went to Ms. Reimers' desk to fill out a leave slip for December 26th. *Id.* at 89. Ms. Reimers told him not to bother submitting it, because it would be denied. *Id.* Mr. Rodriguez responded saying, "Fu*** off". *Id.* Ms. Reimers followed him and said, "You're not going to tell me to fu*** off. Fu*** you." *Id.* Mr. Avery then

---

[10] An "emergency placement" allowed the Postal Service to immediately place an employee in off-duty, nonpay status. *Id.* at 77.

[11] For example, in December 2019, Mr. Rodriguez requested New Year's Eve off. *Id.* at 89. Ms. Reimers denied this request based on the needs of the Service but approved his November 2019 request for annual leave on the days before and after Thanksgiving. *Id.*

approached and stood between them, putting his hand on Mr. Rodriguez's chest, to diffuse the situation and to block Mr. Rodriguez from going any further or getting into anyone's face. *Id.* Mr. Rodriguez said, "get your fu*** hands off my chest," and continued to say, "fu** you, fu*** you, fu*** you," because he was at his "wits end with them". *Id.* This incident took place on the workroom floor at Sooner Station and was disruptive to other carriers because at least eight other Postal Service employees witnessed this altercation. *Id.* Mr. Rodriguez was then told by Station Manager Swaner to leave the building and not to return until he was contacted. *Id.* Mr. Rodriguez is sorry for how he reacted that day. *Id.*

After this incident, Ms. Reimers requested an Emergency Placement for Mr. Rodriguez because she felt he violated the Workplace Violence Policy along with several other USPS policies. *Id.* She believed Emergency Placement was appropriate as soon as Mr. Rodriguez began aggressively yelling "fu** you" and "fu** y'all". *Id.* Postmaster Steelman was not present for the altercation; however, as soon as Station Manager Swaner reported it to him, he immediately asked if Mr. Rodriguez had been put on Emergency Placement because he was yelling and screaming, disrupting those on the workroom floor, and there was a

concern during the incident that Mr. Rodriguez would physically attack Ms. Reimers. *Id.* at 90. That same day, Postmaster Steelman emailed the District Office requesting an Emergency Placement for Mr. Rodriguez pending an investigation of the incident. *Id.* Mr. Rodriguez believes he was put on Emergency Placement due to his race, color, national origin, and gender, because he was a Hispanic male screaming at a white female, and she did not like the way he said "fu*** off". *Id.*

## II.    The District Court's Order Granting Summary Judgment

The district court outlined the facts, noting they are "essentially undisputed" and explaining that Mr. Rodriguez was hired by the Postal Service in January 2003, became a full-time rural carrier in 2007 or 2008, and claims treatment by the Postal Service changed in May 2020 after new management officials began at the Sooner Station. [ROA, Vol. II, at 237] [Order at 1] The district court further noted that Mr. Rodriguez took issue with route adjustments, route reductions, and decreased compensation; the Postal Service's reaction to his physical altercation with a route customer in July 2020; and the Postal Service's response to Mr. Rodriguez telling his supervisor to "fu** off," which eventually resulted in his termination and/or resignation. *Id.* at 238. [Order at 2]

14

### A. Judgment on Mr. Rodriguez's Claims

#### 1. Title VII Gender, Race, Color, National Origin Discrimination Claims

The district court correctly explained that Mr. Rodriguez's claims fell under the *McDonnell Douglas* burden-shifting framework and stated his requirements for establishing a prima facie case. *Id.* at 239. The court further explained that Mr. Rodriguez had arguably met a prima facie case on his claims for gender, race, color, and national origin discrimination, which simply left "the question of whether plaintiff has made a sufficient showing that the adverse personal action(s) were impacted by wrongful discrimination." *Id.* at 240. Since this question "largely overlap[ed]" with the question of pretext, the court chose to evaluate those together. *Id.* It concluded that Mr. Rodriguez's evidence was insufficient to support an inference of discriminatory motives or that the Postal Service's actions were pretextual. *Id.* at 241. [Order at 5]

#### 2. Title VII Gender, Race, Color, National Origin Hostile Work Environment Claims

The district court arrived at the same conclusion regarding discriminatory motives for Mr. Rodriguez's hostile work environment claims. *Id.* at 242. After explaining the standard articulated in *Hall v.*

15

*U.S. Dept. of Labor*, 476 F.3d 847, 851 (10th Cir. 2007), the district court concluded that Mr. Rodriguez appeared to concede his hostile work environment claims and, even if he did not, the evidence presented to the court was still insufficient to establish a hostile work environment. *Id.* [Order at 6]

### 3. Rehabilitation Act Hostile Work Environment and Discrimination

In the context of his Rehabilitation Act claims, the district court analyzed Mr. Rodriguez's claimed physical (pinky injury) and mental (fight-or-flight) disabilities. *Id.* Before this Court, Mr. Rodriguez raises only his pinky injury, making no reference to his alleged mental disability. [Aplt. Br. 1-12] While the district court noted that it is questionable whether Mr. Rodriguez is disabled within the meaning of the Rehabilitation Act, it held that there is "no evidence here that would plausibly support an inference that defendant's actions…were on the basis of…his claimed disability." *Id.* at 243. [Order at 7]

### 4. Title VII Retaliation Claims

The district court then turned to Mr. Rodriguez's retaliation claim. *Id.* at 243. It considered evidence of his EEO contact on October 20, 2020,

and noted that he likely suffered an adverse personnel action. *Id.* at 244. Construing these facts in Mr. Rodriguez's favor, the district court still held that Mr. Rodriguez failed to present evidence of "circumstances that justify an inference of retaliatory motive". *Id.*

## <u>Summary of the Argument</u>

Mr. Rodriguez alleges he suffered discrimination from four different supervisors in the form of a hostile work environment, disparate treatment, and retaliation. He further contends this conduct occurred because of nearly every one of his protected characteristics: that he is a brown, Hispanic, Mexican American, male who purportedly suffers from a pinky injury. Despite working at Postal Service for approximately 17 years without issue and having the same first-line supervisor (Amber Reimers) since 2018, Mr. Rodriguez contends Postal Service management precipitously developed discriminatory and retaliatory animus in May of 2020.

Critically, Mr. Rodriguez did not show that the Postal Service demonstrated any discriminatory or retaliatory animus toward him; instead, he pointed only to the fact that he has protected characteristics. But merely being in a protected class is not evidence of discriminatory or

17

retaliatory animus. Rather, the evidence presented shows that the actions he complained of were either directed or approved by **individuals whom he never met**. Indeed, while Mr. Rodriguez worked in a field office, his route adjustments were based on directives from Postal Service officials located in the District, Area, and National Offices, and the field office's request for Emergency Placement was sent to the District Office. [ROA, Vol. I, at 172] Mr. Rodriguez additionally could not overcome the legitimate, business reasons behind each of these data-driven decisions. *Id.* at 108-110. In sum, Mr. Rodriguez presented to the district court a laundry list of benign, innocuous workplace events beginning in May 2020 but failed to show that he suffered actionable discrimination or retaliation. He does the same on appeal.

Rather than identifying any meaningful error with district court's review and understanding of the facts, Mr. Rodriguez presents a multitude of evidence and arguments that are waived. He then argues the district court conflated his two EEO Complaints (Case Nos. 4G-730-0028-21 and 4G-730-0004-21). However, a plain reading of the exhibits before this Court dispels that argument, and Mr. Rodriguez fails to offer any additional context for how this issue would impact the Court's ruling.

18

In sum, none of the issues raised by Mr. Rodriguez affect the ultimate grant of summary judgment.

## Argument and Authority

### I.   Mr. Rodriguez Has Waived Several Arguments, and He Now Raises New Arguments with New Evidence.

The core of Mr. Rodriguez's brief focuses on various arguments and evidence that are being raised for the first time on appeal. For example, Mr. Rodriguez now contests some of the evidence presented by the Postmaster as "hearsay" [Aplt. Br. at 2 § 2 and 10 § 5] or "fraudulent." *Id.* at 11 § 6. He additionally presents new evidence in the form of Exhibits 2.1, 2.2, 3, 4, 5, 6.1, 6.2, 7.1, 7.2, 7.3, 8, 9, 10, 11. *Id.* at 15-29. But his only appellate exhibits previously submitted to the district court are Exhibits 1 and 1.2, *id.* at 13-14, and his arguments contesting the evidence were not raised before the district court. *Id.*

Rather, Mr. Rodriguez offered a brief Statement of Facts and overwhelmingly admitted all but three of the Postmaster's Statement of Material Facts ("SOMF"). [ROA, Vol. II, at 139-157] He did not object to any evidence as hearsay or fraudulent, nor did he present most of the exhibits he attempts to present now to this Court. *Id.* at 134-166. Therefore, Mr. Rodriguez's objections to certain exhibits and the new

exhibits he attempts to introduce have been waived. *See Luster v. Vilsack*, 667 F.3d 1089, 1095–96 (10th Cir. 2011) (holding that this Court will not consider on appeal issues that were not raised before the district court).

Next, Mr. Rodriguez argues that Postal Service management officials shared his personal information along with their business cards with the Postal Service customer from his July 2020 altercation, and that local Postmaster Steelman offered misleading information in his post-resignation workers' compensation paperwork. [Aplt. Br. at 3] Regarding the former, Mr. Rodriguez now alleges a Privacy Act violation which was not plead in his Complaint [ROA, Vol. I, at 7-17] nor was it addressed in his response brief with the district court. [ROA, Vol. II, at 134-166]

Indeed, Mr. Rodriguez previously argued that this information simply went to the "overall harassment he received" and the "credibility of management personnel involved" *Id.* at 165. The same is true for his latter allegation involving local Postmaster Steelman. *Id.* He cannot now attempt to raise new arguments on appeal as they have been waived. *Little v. Budd Co., Inc.*, 955 F.3d 816, 821 (10th Cir. 2020), *as corrected* (Apr. 6, 2020) (explaining that whether the new argument is a "bald-faced" new issue or falls under the same general category of argument,

20

such arguments are still waived) (citing *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 999 (10th Cir. 2002)).

Similarly, Mr. Rodriguez now takes issue with the district court's analysis of his settlement agreement, arguing that it has been breached and that his termination was unwarranted. [App. Br. at 3] As explained in more detail below, Mr. Rodriguez did not raise this issue before the district court. It, too, is accordingly waived. *Id.*

Finally, Mr. Rodriguez waives several arguments by not discussing them on appeal. In his appellate brief, he fails to reference his alleged mental health injury of "fight-or-flight" and makes no reference to Incidents Four, Six, Eight, or Nine. [Aplt. Br. 1-12] This "fight-or-flight" claim and the above Incidents are therefore waived. *Est. of Cummings by & through Montoya v. Cmty. Health Sys., Inc.*, 881 F.3d 793, 801 (10th Cir. 2018)(explaining that abandoning an issue on appeal carries the same consequences as an adverse appellate ruling).

The remaining issues raised in Appellant's brief are simply a recitation of arguments already found unpersuasive by the district court. This Court should affirm the district court's findings regarding those arguments, for the reasons discussed below.

## II.  The District Court Properly Found Mr. Rodriguez Failed to Establish Title VII Discrimination or Retaliation.

### A. Standard of Review

"This court reviews the district court's grant of summary judgment *de novo*, using the same standards applied by the district court." *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004) (citation omitted). Additionally, this Court is not required to affirm the district court's opinion on the same grounds relied upon by the district court, but "may affirm the district court for any reason supported by the record." *Amro v. Boeing Co.*, 232 F.3d 790, 796 (10th Cir. 2000) (citation omitted).

Summary judgment is appropriate if the evidence presented by the parties demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "view[s] the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011) (citation omitted).

Under Title VII, a plaintiff bears the burden of ultimately showing intentional discrimination, *i.e.*, that her employer intentionally treats some people less favorably than others because of a protected

characteristic. 42 U.S.C. § 2000e-16(a); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805-06 (1973). Additionally, Title VII prohibits retaliation against an employee who has opposed any unlawful practice. *Robinson v. Barrett*, 823 F. App'x 606, 610 (10th Cir. 2020) (unpublished).[12]

When a plaintiff relies on circumstantial evidence of discrimination and retaliation, as in this case, the Tenth Circuit applies the burden-shifting framework as set forth in *McDonnell Douglas*, 411 U.S. at 802, and its progeny. *See Robinson*, 823 F. App'x at 610. *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (internal quotation marks omitted). At that point,

> "the burden shifts to the defendant employer to state a legitimate, nondiscriminatory reason for its adverse employment action. If the employer meets this burden, then summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual."

*Id.* (quotation and citation omitted).

---

[12] Mr. Rodriguez did not raise a Rehabilitation Act retaliation claim before the district court. [ROA, Vol. I, at 124]

The burden to establish a prima facie case is "exceedingly light." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007). In contrast, to satisfy his burden of establishing pretext, Mr. Rodriguez must show that the Postmaster's reasons are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Id.* (quotation and citation omitted).

### B. The District Court Correctly Dismissed Mr. Rodriguez's Retaliation Claim.

Before this Court, Mr. Rodriguez's only retaliation claim relates to Incident Seven.[13] To establish a prima facie case of retaliation, a plaintiff must show that he was (1) engaged in a protected activity, (2) suffered an adverse personnel action, and (3) that a causal connection existed between the protected activity and the adverse action. *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) (setting forth the causation standard for claims under the Age Discrimination in Employment Act, which language mirrors Title VII).

---

[13] Before the district court, Mr. Rodriguez identified only Incidents Five through Nine as retaliation. [ROA, Vol. I, at 72] Of those incidents, he references only Incident Seven (Emergency Placement) before this Court.

Before the district court, Mr. Rodriguez did not present evidence that any adverse personnel actions "were the result of his EEO activity." [ROA, Vol. II, at 244] [Order at 8] But even if he had, the Postmaster provided a legitimate, non-retaliatory reason for Mr. Rodriguez's Emergency Placement, which he failed to establish as pretextual. Accordingly, the district court correctly dismissed his retaliation claim.[14]

## C. The Postmaster's Legitimate, Business Reasons for its Actions

The Postmaster's explanations for Mr. Rodriguez's route changes and Emergency Placement were overwhelmingly admitted in the proceedings below. [ROA, Vol. I, at 108-110 & USPS SOMF 1, 7-10, 12, 14, 16-20, 35-38, 40, 47-53, 68-74][15] Before this Court, Mr. Rodriguez raises Incidents One, Two, Three, and Seven. [Aplt. Br. at 3-4, 7-9] Indeed, Mr. Rodriguez did not articulate any meaningful dispute with the Postmaster's stated explanation for his route changes (Incident Three) and emergency

---

[14] Although the district court cited to a Rehabilitation Act case in its analysis, Mr. Rodriguez did not raise a Rehabilitation Act retaliation claim and does not do so now. [ROA, Vol. I, at 7-17; *see also* ROA, Vol II, at 124]

[15] In fact, Mr. Rodriguez explicitly denied only SOMF 69, but he failed to offer any meaningful evidence to create a genuine dispute of material fact as to any of the Postmaster's SOMF. [ROA, Vol. II, at 139-157]

placement (Incident Seven). [ROA, Vol. II, at 139-157] His appeal suffers the same deficiencies.[16]

### 1. *Route Change* (Incident Three)

Information was routinely disseminated from National, Area, and District Offices to those in the field offices. [ROA, Vol. I, at 77-78] In September 2020 Mr. Rodriguez's route was selected by the National Office along with 2,000 other rural routes across the country to participate in a Special Count. *Id*. at 84-86. Pursuant to USPS CBA, both RR18 and RR40 were selected because there were two-hour changes in each route's evaluated hours and a change in each route's L status. *Id*. These route changes were determined by those in the National and District Offices and based on the needs of the Service. *Id*. at 74-78, 84-85.

### 2. *Emergency Placement* (Incident Seven)

On December 21, 2020, Mr. Rodriguez became angry upon learning that his leave request, submitted only five days in advance, would be

---

[16] Mr. Rodriguez previously identified Incidents One and Two as part of his hostile work environment claim – not part of any retaliation claim or discrete act of discrimination. [ROA, Vol. II, at 165] The Postmaster therefore did not proffer a legitimate, business reason for these two actions below. [ROA, Vol. I, at 108]

denied. *Id.* at 88-90. But critically, holiday leave was typically scheduled well in advance and requested on a PS Form 3971; Mr. Rodriguez was aware of this given his utilization of prior leave requests. *Id.* In response to the leave request denial, Mr. Rodriguez was involved in an expletive-filled exchange with his first-line supervisor, Ms. Reimers. *Id.*

Mr. Avery then had to block Mr. Rodriguez to diffuse the situation and to keep Mr. Rodriguez from advancing any further. *Id.* Mr. Rodriguez continued on an expletive-filled rant causing Station Manager Swaner to become concerned that Mr. Rodriguez was going physically attack Ms. Reimers. *Id.* This concern prompted Station Manager Swaner to tell Mr. Rodriguez to leave the building and not return until contacted. *Id.* local Postmaster Steelman immediately initiated an investigation, after which Station Manager Swaner's action was affirmed by the District Office and Postmaster Steelman. *Id.* The Service, and particularly the Oklahoma District[17], takes concerns of workplace violence seriously and must be responsive to even an intimation of such conduct. *Id.* at 110.

---

[17]In 1986, a postal carrier in Oklahoma came back to his workplace after being reprimanded by management and killed 14 people including the supervisors that reprimanded him. [ROA, Vol. I, at 173]

27

**D. The District Court Correctly Found That Mr. Rodriguez Failed to Create a Genuine Dispute of Material Fact As To Pretext.**

When assessing pretext for claims of discrete discrimination, the Court must examine the facts as they appear to the person making the decision to take an adverse action. *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001). To establish that an employer's actions were pretext for a discriminatory or retaliatory motive, the plaintiff is required to provide evidence that the employer's stated reasons for the personnel action were not held in good faith at the time they occurred. *Young v. Dillon Co., Inc.,* 468 F.3d 1243, 1250 (10th Cir. 2006); *see also Bekkem*, 915 F.3d at 1273-74.

The Court's role is not to "second guess[] employers' honestly held (even if erroneous) business judgments." *Id.* (citation omitted). Rather, the Court examines "the facts as they appear to the person making the decision" and does not "look to the plaintiff's subjective evaluation of the situation." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011) (cleaned up).

The relevant question for the Court, particularly as to Incident Seven, is whether Mr. Rodriguez's supervisors believed he was a danger to

28

others – not whether Mr. Rodriguez intended to be a danger or whether he actually posed a threat at that exact moment. Rather, the Court should consider the issue from the perspective of Mr. Rodriguez's supervisors, who were evaluating the incident close-in-time, to determine whether they believed he posed a danger to other employees. Because Postal Service management held this belief, Mr. Rodriguez could not establish pretext for their actions following the incident. *Rodriguez v. Brown*, No. 21-1124, 2022 WL 3453401, at *14 (10th Cir. Aug. 18, 2022) ("Nor does [the plaintiff] assert any evidence suggesting that the Sheriff or [her] subordinate chain of command, *even if mistaken*, did not honestly believe that Rodriguez had failed her remedial training.") (emphasis added).

Mr. Rodriguez now takes issue with the timeline utilized by the district court, arguing that his discrimination claims were raised before his termination/resignation, not after. [Aptl. Br. at 9-10 § I & J] He argues that in this regard the district court "mix[ed] up" his EEO Complaints. *Id.* However, the Postmaster's SOMFs 30, 31, 32 and 83[18]

---

[18] Mr. Rodriguez mislabeled this Statement of Fact as "82".

are undisputed [ROA, Vol. II, at 141 & 155], and these conceded facts show that Mr. Rodriguez contacted the EEO Office on October 20, 2020, regarding his route changes. [ROA, Vol. I at 80, 91] The EEO Office then accepted nine incidents, including his emergency placement, on February 24, 2021, and issued a Final Agency Decision regarding those incidents on April 25, 2022. *Id.*; *see also* [ROA, Vol. II, at 17-62 & 106-19] EEO Complaint No. 4G-730-0028-21 related to Mr. Rodriguez's termination and subsequent resignation, while EEO Complaint No. 4G-730-0004-21 addressed his route changes, emergency placement, etc. *Id.*; *see also* [ROA, Vol. I, at 240-243]

Even if Mr. Rodriguez's allegations were accurate (they are not), he fails to offer any context for how this would impact the district court's ruling.  Moreover, the district court's order is based on the substantive allegations made in his Complaint. Importantly, Mr. Rodriguez never contested his termination before the district court and does not attempt to do so now. Even if he had on both accounts, it has been waived.

## III.  The District Court Properly Found Mr. Rodriguez Did Not Establish a Rehabilitation Act Violation.

Under the Rehabilitation Act, the federal government is prohibited from discriminating against an "otherwise qualified individual with a

disability", 29 U.S.C. § 794(a), and provides the exclusive remedy for disability discrimination claims brought against federal employers. *Padilla v. Mnuchin*, 836 F. App'x 674, 676–77 (10th Cir. 2020).

On appeal, Mr. Rodriguez abandons his mental disability claim focusing instead on his claim that he suffered from a physical disability. [Aplt. Br. 1-12] Mr. Rodriguez now seems to contest this as a workplace injury. *Id*. He additionally raises prior concerns that he was assaulted while working (Incident Two), referencing Postal Service "negligence" because of an alleged failure to report it on OSHA logs. *Id*. This point was considered by the district court and found to be unpersuasive in light of the other evidence related to Mr. Rodriguez's purported physical disability. [ROA, Vol. II, at 242-243] This is because Mr. Rodriguez never provided any evidence that he notified his supervisor that his pinky injury was anything other than a badly jammed finger that would eventually heal. *Id*. Vol I, at 83-83. Indeed, the district court found it undisputed that the Postmaster "was never on notice of any disability

based on the injured finger." *Id*. Vol. II, at 242-243.[19] [Order at 7]

Mr. Rodriguez now claims that the district court identified him as the aggressor in this July 2020 incident. This claim is false. The Court stated, "[Mr. Rodriguez] appears to object to defendant's reaction to a physical fight he got into with a route customer in July 2020, or at least views that fight as the basis for him having a disability that is the basis of his [Rehabilitation Act] claim." *Id*. at 238. [Order at 2] Mr. Rodriguez fails to meaningfully contest the district court's ruling on his Rehabilitation Act claims, and his attempts to overturn those rulings accordingly fail.

## IV.    The District Court Properly Found That Mr. Rodriguez Did Not Experience a Hostile Work Environment Based on His Protected Characteristics.

"A hostile work environment claim is 'composed of a series of separate acts that collectively constitute one unlawful employment practice.'" *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251–52 (10th Cir. 2021) (quoting *Nat. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). To survive summary judgment on a hostile work environment claim, a

---

[19] And importantly, an EEO lawsuit is not the appropriate place to lodge a workers' compensation claim. *See Ash v. Buttigieg*, No. 22-6195, 2023 WL 6293823, at *3 (10th Cir. Sept. 27, 2023).

plaintiff must show: "(1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment…stemmed from [discriminatory] animus." *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir. 1994).

Mr. Rodriguez did not contest Incident One as a discrete act; rather, he argued that this incident was part of a hostile work environment. [ROA, Vol. I, at 72] When reviewing the facts related to Incidents One, Two, Three, and Seven, Mr. Rodriguez's only evidence of a hostile work environment based on his protected characteristics is to identify himself as a brown, Hispanic, of Mexican American descent, with a pinky injury, and that his supervisors are white or black, Caucasian, and Americans. This is insufficient under Title VII. *See Alabi v. Vilsack*, 860 F. App'x 576, 582–84 (10th Cir. 2021) (explaining that a "single incident of physically threatening conduct" is insufficient to establish the steady barrage required for a hostile work environment claim).

Before this Court, Mr. Rodriguez states management's action made him believe he should "[w]ork Mexican, [w]ork!" [Aplt. Br. at 5-6] But as explained in detail before the district court, his belief was not based on any comments by management. Indeed, his own deposition provides the

33

necessary context:

> 7 **Q Okay. And why did you believe this**
> 8 **route change was based on your color?**
> 9 A Because they wanted me to work more.
> 10 **Q Okay.**
> 11 A I -- I -- I have said that reference
> 12 that they were basically treat -- the way it was
> 13 projected to me was on how Mexicans come across
> 14 in culture. Work Mexican work. That's what it
> 15 translated to.
> 16 **Q Did someone say that to you?**
> 17 A No. But how it was coming across was
> 18 like, doesn't matter. You can work more.
> 19 **Q Uh-huh.**
> 20 A You ain't going to say nothing. You're
> 21 just going to work. And that's how it was coming
> 22 across to me.
> 23 **Q How -- how was that coming across to**
> 24 **you?**
> 25 A Because I was the only one that was
> 1 being required to work an additional day or have
> 2 my salary cut, and I couldn't afford to get my
> 3 salary cut because I have a child.
> 4 **Q Uh-huh.**
> 5 A So -- and all the -- all the other times
> 6 that I'm not working, I'm with my child. So yes,
> 7 it's -- having to work more was very
> 8 discriminative.
> 9 **Q And just to clarify, Mr. Rodriguez, any**
> 10 **other reason why you believe that incident was**
> 11 **based on your color?**
> 12 A Because I was brown.
> 13 **Q Okay.**
> 14 A And no other person of different color
> 15 was being affected.
> 16 **Q Any other reason?**
> 17 A No.

[ROA, Vol. I, at 379-380]

Mr. Rodriguez's offered evidence did little more than demonstrate neutral and benign workplace conduct. He failed to meet his burden to establish a hostile work environment. In sum, whether Mr. Rodriguez's incidents are reviewed individually for disparate treatment or taken together as contributing to a hostile work environment, they still fail.

## V.  The District Court Properly Found That Mr. Rodriguez Failed to Offer Evidence of Discriminatory or Retaliatory Animus.

Mr. Rodriguez simply presents no evidence that the conduct at issue was motived by discriminatory or retaliatory animus. *See Rodriguez*, 2022 WL 3453401, at *12 (noting that the plaintiff acknowledged that no one in her workplace made derogatory comments based on her race, sex, or national origin, and "[t]here was, then, no discriminatory context through which a reasonable jury could infer than any of the neutral acts taken against her were actually because her race, sex, or national origin" for either claims of harassment or disparate treatment). As such, the district court's ruling on summary judgment should stand.

## Conclusion

The district court correctly granted judgment in the Postmaster's favor. Mr. Rodriguez spends much of his brief identifying alleged errors

but fails to meaningfully contest the district court's ultimate conclusions in this case – that he did not create a genuine issue of material fact on the issue of pretext, and that he failed to offer evidence of discriminatory or retaliatory animus. For all the foregoing reasons, this Court should affirm the district court's grant of summary judgment.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

*s/Rebecca A. Frazier*
REBECCA A. FRAZIER, OBA #22285
SARAH GREENWALT MCMURRAY,
OBA #31566
Assistant U.S. Attorney
210 Park Avenue, Suite 400
Oklahoma City, OK  73102
(405) 553-8700  Fax: (405) 553-8885
**Rebecca.Frazier@usdoj.gov**
**Sarah.McMurray@usdoj.gov**
Counsel for Defendant

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains <u>7,678</u> words and <u>863</u> lines, inclusive of headings, footnotes, and quotations. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using <u>Microsoft Word</u> in <u>Century Schoolbook 14-point font</u>, a proportionally spaced typeface.

*s/ REBECCA A. FRAZIER*
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on the <u>22nd day of May</u>, 2024, I electronically filed the foregoing document in the United States Court of Appeals for the Tenth Circuit by using the Court's CM/ECF system. I further certify that I served a copy of the foregoing document by <u>United States Mail</u> on the following party, who is not a registered user of the Court's CM/ECF system:  <u>Mr. Raul Rodriguez, Jr.</u>

*s/ REBECCA A. FRAZIER*
Assistant U.S. Attorney

37

## INDEX OF ATTACHMENTS

Attach. 1:     *Raul Rodriguez, Jr. v. Louis DeJoy, Postmaster General*, Case No. CIV-22-618-HE, United States District Court for the Western District of Oklahoma, Order [Doc. 55] (order of dismissal)

Attach. 2:     *Raul Rodriguez, Jr. v. Louis DeJoy, Postmaster General*, Case No. CIV-22-618-HE, United States District Court for the Western District of Oklahoma, Judgment [Doc. 56]